The TRAVELERS INDEMNITY
COMPANY

v.

Ann Stevens HUNTER and
Jerome Hunter.

Civ. A. No. 83–22.

United States District Court,
E.D. Louisiana.

May 25, 1984.

---

P. Albert Bienvenu, Jr., New Orleans, La., for plaintiff.

Harold Douglas, New Orleans, La., Larry J. Green, Covington, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. At about 5:00 a.m. on Friday, April 16, 1982, the Covington Fire Department arrived and extinguished a house fire at 928 West 29th Avenue in Covington, Louisiana. Plaintiff is an insurer which paid proceeds to the mortgagee and now as subrogee has sued the owner, alleging arson.

2. On May 4, 1977, Jerome Hunter and Ann Stevens Hunter purchased a one-story frame house with brick veneer and lot at 928 West 29th Avenue in Covington, Louisiana, for $19,000.00.

3. The Hunters executed a note and mortgage to Ambank Mortgage Co., One American Place, Baton Rouge, Louisiana, in the sum of $19,000.00, payable at $146.68 per month.

4. The Hunters separated voluntarily in November, 1980; Ann Hunter obtained a judgment of divorce in the 22nd Judicial District Court for the Parish of St. Tammany, Louisiana, on February 20, 1981.

5. In separating, Ann Hunter left the house on West 29th Avenue, moved in briefly with her mother who also lived in Covington, then moved to New Orleans, Louisiana, where she worked at South Central Bell Telephone Company.

6. On May 4, 1981, plaintiff, The Travelers Indemnity Company, issued a fire insurance policy, number 910432527–632–1, covering the house at West 29th Avenue in the amount of $28,000, as well as $14,000 on the contents and $5,600 living expenses.

7. At some time near the start of the new year 1982, Jerome Hunter, who up to that time had resided in the house at West 29th Avenue, discovered that Ann Hunter had resumed occupancy, changing the locks. By agreement, Jerome Hunter took some of his possessions and moved out of the house.

8. The Hunters were unable to agree to a partition of the property. Jerome Hunter's attorney notified Ann Hunter by letter that he expected some agreement by June 30, 1982.

9. Ann Hunter's cousin, Grady Mosley, moved into the house with her in January, 1982, and shared expenses.

10. During the late winter and spring of 1982, Ann Hunter encountered a run of financial difficulties. She had missed note payments on the house since resuming occupancy; the telephone had been disconnected; she had drawn several checks on insufficient funds on her credit union account. She had outstanding loans from Citizen's Finance and St. Tammany Parish First National Bank, payable at the rates of $220 and $54 per month, respectively. The 1978 Buick, on which she was still making monthly payments of $150, and which she drove to work daily, was beginning to have mechanical failures. At least one credit application had been rejected that spring.

11. On Thursday, April 15, 1982, Ann returned home from her office between 5:15 and 5:30 p.m. Grady Mosley moved out of the house that afternoon, ostensibly because of a dispute over expenses. Grady Mosley took most of his possessions to his mother's house, but left some bedroom furniture, a refrigerator, sofa and chairs, as well as a few small items.

12. After Grady Mosley's departure, Ann Hunter's brother, Mitchell Stevens, arrived. He stayed just long enough to eat a sandwich, then went to a telephone booth nearby to notify Ann Hunter's boyfriend, Walter Austin, to pick her up. Ann Hunter watched television until Walter Austin's arrival at 8:00 p.m. She left with him and spent the night with him.

13. At that time, Mitchell Stevens was sharing an apartment near the house with Leonard Davis. The two roommates returned to the house between 9:00 and 11:00 p.m. There, they washed clothes and ate hamburgers. Mitchell Stevens experimented with lighter fluid and cooking grease, dousing and lighting items in the house, then using a fire extinguisher. Mitchell Stevens asked Leonard Davis to help him to set the house afire. Leonard Davis refused, and left shortly after midnight.

14. Leonard Davis returned to the apartment and went to bed. Mitchell Stevens arrived at about 5:00 that morning, waking Davis up on his arrival. He was carrying a portable washer, television, and stereo from the house. Fire engines were audible.

15. At about 6:00 a.m., Ann Hunter and Walter Austin stopped by the extinguished fire on the way to work, and spoke with officials still present on the scene.

16. Expert testimony at trial established the cause of the fire to be arson. Not only were three distinct points of origin found (the living room, den, and bedroom); circumstantial evidence indicated the use of petroleum-based or other liquid accelerants. The burn patterns were uneven, indicating that the spread had not been consistent as would have been an accidental fire. In the course of the firefighting, Fire Chief James Grogan observed that the living room fire reflared several times after appearing to be extinguished, also an indication of the use of liquid accelerants. (The den and bedroom points of origin being out of view until later, it was not clear whether these sections had reflared.) No accidental cause for the fire, such as a smouldering cigarette or faulty electrical equipment, was found or indicated.

17. The Hunters had been the victims of a minor attempted arson a few years earlier, when a flaming newspaper was thrust between the front door and screen as they slept. Evidence gathered from the April, 1982 burning, however, did not indicate an unauthorized entry. Of the several windows which broke, the glass was sooted, revealing that it had become dislodged after the fire commenced—most likely during the course of firefighting. Similarly, expert testimony explained that the doors had been broken in the course of the firefighting, and not before.

18. Approximately one week after the fire, Ann Hunter visited Leonard Davis at his apartment and asked what he knew about the fire. When he responded that he knew nothing, she said, "Yes, you do. You know you'd have to testify." She recommended that Mitchell Stevens and he contrive and coordinate an alibi.

19. Detective Johnny Dillon of the Covington Police Department was formerly a brother-in-law of Ann Hunter, having married Jerome Hunter's sister, but separated in June, 1980. The fire marshall involved him in the arson investigation on April 22, 1982, and he met with Chief Grogan on April 25.

20. On May 25, 1982, Ann Hunter called Detective Dillon at home and said that she needed to talk. He met her at a shopping center. Apparently unaware of his involvement in the case, she began to tell him of the burglary investigation arising out of Mitchell Stevens' theft and sale of the portable washer, television and stereo. Detective Dillon testified that she said, "Johnny,

I'm telling you as a friend—I asked Mitchell to burn the house. I asked him not to take anything but he did and that is why we're in trouble now."

*Conclusions of Law*

1. This court has subject matter jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332.

2. The evidence established that Ann Hunter fraudulently procured the burning of the house at West 29th Avenue, under any of the burdens of proof arguably applicable to circumstantial evidence in arson cases. *Compare DeBattista v. Argonaut-Southwest Insurance Co.*, 403 So.2d 26, 29 (La.1981), *with Rist v. Commercial Union Insurance Co.*, 376 So.2d 113, 114 (La. 1979).

3. Accordingly, plaintiff is entitled to recover as subrogee the full amount which it paid to the mortgagee on the fire insurance policy.

Counsel for plaintiff will submit a judgment consistent with these findings.