526 So.2d 1325 (1988)
John Burley PRATHER, Plaintiff-Appellant,
v.
CATERPILLAR TRACTOR COMPANY, INC. and Boyce Machinery Corporation, Defendants-Appellees.
No. 87-314.
Court of Appeal of Louisiana, Third Circuit.
May 11, 1988.
*1326 Bruce A. Gaudin, Opelousas, plaintiff-appellant.
McGlinchey, Stafford & Mintz, C.G. Norwood, Jr., New Orleans, Mathews, Atkinson, Guglielmo, Marks & Day, Judith R. Atkinson, Baton Rouge, Raggio, Cappel, Chozen & Berniard, M. Keith Prudhomme, Lake Charles, defendants-appellees.
Before DOMENGEAUX and GUIDRY, JJ., and REGGIE,[*] J. Pro Tem.
GUIDRY, Judge.
This is a products liability case. John Burley Prather allegedly injured himself on December 3, 1982, when he slipped while attempting to climb into a Caterpillar Model 215 Excavator at the Clifton Ridge Terminal belonging to Conoco, Inc. The accident occurred in Calcasieu Parish, Louisiana. Prather brought this products liability suit against Caterpillar Tractor Company, Inc. (hereafter Caterpillar), the manufacturer of the excavator, and Boyce Machinery Corporation (hereafter Boyce), the owner/lessor of the excavator, alleging that the excavator's ingress/egress system was defective because of its design. Boyce filed a third party demand against Caterpillar for contribution and/or indemnity in the event it was held liable. Fireman's Fund Insurance Company (hereafter Fireman's) intervened to recover worker's compensation benefits and medical expenses paid to plaintiff. All parties stipulated that Fireman's was entitled to $41,616.00 for worker's compensation benefits and $37,528.42 in medical expenses to be paid in preference out of any award made to plaintiff. A jury unanimously found that the Caterpillar Model 215 Excavator was free of any defect when it left the custody and control of Caterpillar and no negligence on the part of Boyce. The jury also found on a vote of 11 to 1 that plaintiff was 100% at fault. The trial court rendered judgment pursuant to the verdict, dismissing plaintiff's suit. Plaintiff appealed. Firemen's the intervenor, has not appealed.

FACTS
Conoco, Inc. contracted with Tetra Enterprises, Inc. (hereafter Tetra) to do excavation work on a pipeline at its Clifton Ridge Terminal in the lower part of Calcasieu Parish, Louisiana. E.J. Naquin, the pipeline superintendent for Tetra, leased a Caterpillar Model 215 Excavator from Boyce Machinery in Lake Charles, Louisiana. On December 3, 1982, John Burley Prather was employed by Tetra to help strip certain *1327 pipelines at the Clifton Ridge facility. The job required Prather to operate a Caterpillar 215 Excavator and scoop up the dirt over and around the "live" pipelines while several laborers with shovels helped by clearing out the trench. Although plaintiff had been a heavy equipment operator for over 20 years, he had no prior experience operating the Caterpillar Model 215 Excavator.
The Model 215 Excavator being used by Prather was manufactured by Caterpillar in 1981 and was sold to Boyce on April 28, 1982. The Caterpillar Model 215 is the smallest excavator made by Caterpillar. It is designed to operate as a backhoe type machine with a bucket on the end of a boom located at the front end of the unit and is primarily used for scooping and clearing away dirt. The bucket and machine are mounted on treads or tracks similar to those commonly seen on military tanks. It is designed to operate in muddy or other adverse conditions where wheeled vehicles would be unable to function properly. The machine is controlled from a glass encased work station, located beside the engine, which contains the operator's seat and the controls for steering and operating the machine. The tracks on the Model 215 in question were 28 inches wide.
The recommended method of ingress and egress to the cab of the Model 215 is found in Caterpillar's Operator's Guide for the Model 215 and reads in pertinent part as follows:

According to the testimony at trial, the proper method to mount the excavator is for the operator to place both his hands on the grab irons marked 4 and 5 and then place his left or right foot on the step marked number 3, which is the top of the track roller frame guard.[1] Next the operator is to pull himself up maintaining contact with both grab irons while swinging the free foot onto the top of the track. Once this is completed, the foot on the first step is brought up to the top of the track and the operator is free to enter the cab of the unit. To dismount the unit, the operator simply reverses the motions used to mount the unit.
Plaintiff began the Clifton Ridge job on Monday, November 29, 1982, and operated the Model 215 until the accident on Friday, December 3, 1982. A rain occurred on the *1328 night of December 2, 1982. The next day, December 3, 1982, dirt and mud accumulated on and between the tracks and the track roller frame guard. After a short work break to allow the laborers to clean out a trench with their shovels, plaintiff slipped while attempting to get back onto the excavator and allegedly sustained injuries to his back.
On appeal plaintiff urges trial court error as follows:
1. The trial court erred when it excluded evidence offered by plaintiff relating to state of the art in the design of access systems for track type vehicles.
2. The trial court erred when it determined that the Model 215 Excavator was not defective when it left the custody and control of the manufacturer.
3. The trial court erred when it determined that plaintiff was 100% at fault.

ISSUE NO. 1
Appellant first urges that the trial judge erred when he refused to allow him to question Caterpillar employees about alleged admissions made by a Mr. Donald Piepho, a Caterpillar employee, in the case of Caterpillar Tractor Co. v. Gonzales, 562 S.W.2d 573 (Tex.Civ.App.1977), reversed and remanded, 571 S.W.2d 867 (Tex. 1978), on remand, 599 S.W.2d 633 (Tex.Civ. App.1980).
We find no error in the trial court's ruling. Piepho did not testify in the instant case. Admissions allegedly made by him in a case, totally unrelated to the instant case, involving different parties and a different product were clearly irrelevant and immaterial.
Appellant next urges that the trial court erred when it refused to permit plaintiff's safety expert, A.J. Scardino, to testify regarding "state of the art", specifically with regard to the designs for access systems employed by other manufacturers which incorporate the use of a protruding step. Outside the presence of the jury, plaintiff made a proffer of such evidence.
Plaintiff's expert was not prohibited from and did in fact testify regarding state of the art. Further, our examination of the proffered evidence reflects that the evidence offered, regarding specific designs, was irrelevant and that the trial court's ruling was correct.
In Arledge v. Bell, 463 So.2d 856, 859 (La.App. 2d Cir.1985), the court stated the following well-established jurisprudential rule:
"For evidence to be relevant, it must have some probative value and be reasonably connected to the transaction in question. State in the Interest of Miles, 441 So.2d 61 (La.App. 3rd Cir.1983); Associates Financial Services Company, Inc. v. Ryan, 382 So.2d 215 (La.App. 3rd Cir.1980); Vignes-Bombet Co., Inc. v. Rowe, 288 So.2d 889 (La.App. 1st Cir. 1973). The trial court is, however, granted a great deal of discretion in assessing the probative value of evidence. City of Baton Rouge v. Tullier, 401 So.2d 422 (La.App. 1st Cir.1981), writ denied, 406 So.2d 605 (La.1981)."
The record clearly indicates that Caterpillar was aware of the concept of a protruding step. Caterpillar's experts admitted in their testimony that Caterpillar placed such devices on many of its larger units. It is apparent that the proffered evidence was offered to suggest that because other manufacturers equipped their machines with various types of protruding steps, Caterpillar should have placed one on the Model 215. However, upon cross-examination of Scardino during the proffer, he was unable to give the dimensions or even the relative sizes of these allegedly "similar" products in comparison to the Model 215. Consequently, the factual predicate for his alleged "state of the art" testimony and other manufacturer's access system designs was entirely lacking. Thus, this evidence is irrelevant in a determination of whether a protruding step is necessary for safe access to a unit of the size, dimensions and utility of the Model 215. The trial court did not err in refusing to consider the proffered evidence.
Appellant next argues that the trial court erred when it refused to permit Scardino to testify relative to the type of step *1329 required by the Society of Automotive Engineers (SAE) J-185 standard for access systems of off-road vehicles. Defendant objected to this testimony based upon the fact that Scardino is not a "machine designer".
In Thomas v. Black and Decker (U.S.) Inc., 502 So.2d 157 (La.App. 3rd Cir.1987), we stated that:
"... The qualification of an expert witness lies within the wide realm of the trial judge's discretion, and that determination will not be disturbed on appeal except on a showing of manifest error. Bateman v. Power Rig Rental Tool Company, 453 So.2d 998 (La.App. 3rd Cir.1984)...."
The record reflects that Scardino holds only a bachelor's degree in "health, physical and safety education" and many years later received a M.S. in Safety Engineering, and a Ph.D. in Safety and Ergonomics from a California "alternative education" establishment, Kensington University. Scardino has taken no university courses in engineering or machine design. We find no error in the trial judge's determination that Scardino lacked sufficient expertise to testify as to whether the design of a particular step met certain safety standards.
Next, appellant contends that the trial judge erred in refusing to allow Scardino to testify regarding availability of other products to do the same job as the Model 215 but with less risk of harm.
In Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986), the Louisiana Supreme Court ruled that the existence and availability of alternate products "to serve the same needs or desires with less risk of harm" can support a finding that a product may be unreasonably dangerous because of its design. Under such a rationale, evidence or testimony relative to the availability or existence of alternate products which could have been substituted for the product in question to do the same job but with less risk of harm is admissible. The trial judge erred in excluding this evidence. However, because the evidence at trial overwhelmingly reflects that the Model 215 is not defective in design or manufacture, the erroneous exclusion of the aforementioned evidence constitutes harmless error and would not affect the outcome of this case.
Finally, appellant argues that the trial court erred in allowing the introduction of a videotape of various people mounting and dismounting a Caterpillar Model 215 Excavator. Specifically, appellant contends that the machine in the videotape was not the Model 215 on which he was injured and that the videotaping took place at a road construction site in conditions far removed from those experienced by appellant on the day of the accident.
The record indicates that the Model 215 in the videotape was identical to the Model 215 in dispute, including the width of the tracks. Defendant did not suggest that the weather conditions etc. reflected in the videotape were the same as those present on the day of accident. The videotape simply demonstrated the ease with which people of various sizes were able to mount and dismount the Model 215. Receipt of the videotape as demonstrative evidence was proper. Ferguson v. Chrysler Corporation, 292 So.2d 791 (La.App. 1st Cir.1974).

ISSUE NO. 2
Appellant asserts that the jury clearly erred in finding that the Model 215 was not defective when it left the custody and control of the manufacturer, Caterpillar. Specifically, appellant argues that the Model 215 was unreasonably dangerous per se. Alternatively, appellant urges that the Model 215 failed to comply with industry standards; alternate designs were available to manufacture this product with less harmful consequences; and, alternate products were available to serve the same needs with less risk or harm. We find these arguments totally without merit.
In Halphen v. Johns-Mansville Sales Corp., supra, our Supreme Court stated in pertinent part as follows:
"There is general agreement upon the most basic principles of strict tort products liability. In order to recover from a manufacturer, the plaintiff must prove *1330 that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The plaintiff need not prove negligence by the maker in its manufacture or processing, since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its product. Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La.1981); DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981); Hunt v. City Stores, 387 So. 2d 585 (La.1980); Chappuis v. Sears, Roebuck & Co., 358 So. 2d 926 (La.1978); Weber v. Fidelity & Casualty Ins. Co. of New York, 259 La. 599, 250 So.2d 754 (1971).

. . . . .
A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, out weighs the utility of the product.2 Hunt v. City Stores, Inc., 387 So.2d 585 (La. 1980); cf. Entrevia v. Hood, 427 So.2d 1146 (La.1983); Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133, 140 (1971). See Elmore v. Owens-Illinois, Inc., 673 S.W.2d 434 (Mo.1984); Turner v. General Motors Corp., 584 S.W.2d 844 (Tex.1979); Carter v. Johns-Manville Sales Corp., 557 F.Supp. 1317 (E.D.Tex.1983); Prosser and Keeton on Torts, p. 699 (5th Ed.1984); Keeton, Torts, Annual Survey of Texas Law, 1981, 35 Sw.L.J. 1, 9 (1981); Keeton, The Meaning of Defective in Products Liability Law, 45 Mo.L.Rev. 579, 592 (1980). This theory considers the product's danger-in-fact, not whether the manufacturer perceived or could have perceived the danger, because the theory's purpose is to evaluate the product itself, not the manufacturer's conduct. Likewise, the benefits are those actually found to flow from the use of the product, rather than as perceived at the time the product was designed and marketed. The fact that a risk or hazard related to the use of a product was not discoverable under existing technology or that the benefits appeared greater than they actually were are both irrelevant. Hunt v. City Stores, Inc., supra; Keeton, The Meaning of Defect, supra, p. 595; Keeton, Products LiabilityInadequacy of Information, 48 Tex.L.Rev. 398, 407-408 (1970). Under this theory, the plaintiff is not entitled to impugn the conduct of the manufacturer for its failure to adopt an alternative design or affix a warning or instruction to the product. A warning or other feature actually incorporated in the product when it leaves the manufacturer's control, however, may reduce the danger-in-fact. If a plaintiff proves that the product is unreasonably dangerous per se, it is not material that the case could have been tried as a design defect case or other type defect case.
Although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Winterrowd v. The Travelers Indemnity Co., 462 So.2d 639 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La. 1981); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978); cf. Rey v. Cuccia, 298 So.2d 840 (La.1974). In performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby. See Keeton, Product LiabilityProblems Pertaining to Proof of Negligence, 19 Sw.L.J. 26, 30-33 (1965). A manufacturer also has a duty to test and inspect its product, and the extent of research and experiment must be commensurate with the dangers involved. See Dartez v. Fibreboard Corp., 765 F.2d 456 (5th Cir.1985); Gideon v. *1331 Johns-Manville, 761 F.2d 1129 (5th Cir. 1985); Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1089 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); 1 Frumer & Freedman, Products Liability § 6.01[1] & [2]; Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816, 853 (1962).

. . . . .
A product may be unreasonably dangerous because of its design for any one of three reasons: (1) A reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product. This is the same danger-utility test applied in determining whether a product is unreasonably dangerous per se. Keeton, The Meaning of Defect, supra, p. 592; Cf. Hebert v. Brazzel, supra. This first reason for concluding that a design is defective is governed by the same criteria for deciding whether a product is unreasonably dangerous per se. The overlap in categories makes it unnecessary to decide whether a product's defect is one of design or of another kind if the product is proven to be unreasonably dangerous per se. (2) Although balancing under the risk-utility test leads to the conclusion that the product is not unreasonably dangerous per se, alternative products were available to serve the same needs or desires with less risk of harm; or, (3) Although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. See Prosser & Keeton on Torts, p. 699 (5th Ed.1984); Keeton Torts, Annual Survey of Texas Law, 35 Sw.L.J. 1, 9 (1981); Keeton, Products Liability Design Hazards and the Meaning of Defect, 10 Cum.L.Rev. 293, 306 (1976); Wade, on the Nature of Tort Liability for Products, 44 Miss.L.J. 825, 837 (1973)."
Clearly, the Model 215 is not unreasonably dangerous per se. There is no evidence in the record to even suggest such a finding. Likewise, there is no evidence in the record to support appellant's contention that the Model 215's access design failed to comply with industry standards.
Appellant principally contends that the Model 215 was defectively designed because alternate designs were available to manufacture this product with less harmful consequences, i.e. a protruding step. In support of this contention, plaintiff testified that, because of his short stature, he was physically unable to access the Model 215 using the procedure outlined in the operator's manual. According to plaintiff, when he attempted to access the Model 215 in the manner suggested in the manual, his shin came into contact with the top of the track which in turn caused his hips to swing out and away from the machine. This he suggested created a safety hazard.
We do not find appellant's contention supported by the record evidence. To the contrary, we find ample evidence in the record supporting the jury's conclusion that the access design for the Model 215 is not defective.
Although there were no eyewitnesses to the accident, it is undisputed that plaintiff attempted to access the Model 215 by stepping directly from the ground to the top of the track, a distance of 33.5 inches, while only holding onto the left grab iron with both hands. Presumably, the jury determined that his manner of access, contrary to the manufacturer's instructions, and not defective design, caused him to slip and fall. We agree.
Both of defendants' experts, Lammers and Enfield, testified that accessing the Model 215 in the manner recommended in the operator's manual did not result in any abnormal positioning of the body nor did it present any hazard to the average construction worker even with mud accumulated on the track roller frame guard and on the track. Each concluded that access to the Model 215 was simply a climbing function. This testimony was corroborated by the showing of a videotape to the jury where people of various heights, shapes and sizes were filmed easily accessing a Model 215 identical to the one in question. Each person was instructed to access the excavator in the manner recommended in the Caterpillar operator's manual. Defendants' *1332 witness testified that one of the persons videotaped accessing the excavator was even shorter than plaintiff.
As to the necessity of a protruding access step on the smaller Model 215, defendants' heavy equipment design expert, Lammers, who was also the supervising engineer responsible for receiving the design of the Model 215, stated that the test results on the access system design indicated a protruding step on the Model 215 was unnecessary. The test consisted of having the expert, other engineers, and people of various heights, shapes and sizes physically ingress and egress the excavator at Caterpillar's Peoria Proving Ground. Lammers also testified that the positive results of these physical tests precluded any further theoretical testing of the access system design. Both experts also agreed that the best method to determine whether a step is safe is to physically try it. Lammers also stated that the track roller frame guard is a sturdy, convenient, and safe place to put one's foot in order to climb onto the excavator.
Apparently the jury accepted the testimony of defendants' experts and rejected the testimony of plaintiff's in determining that the accidental injury suffered by plaintiff was caused by his manner of access to the Model 215 and not by a design defect. This finding should not be disturbed absent clear error. Finding none, we affirm.
AFFIRMED.
NOTES
[*] Judge Edmund M. Reggie, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] Plaintiff in brief argues that step number 3 of the diagram points to a small protrusion from the side of the track roller frame and thus presents a confusing picture to anyone who might try to understand exactly what method of entry is recommended by the manufacturer. Norman Lammers, a former Caterpillar employee, testified that the protrusion is part of the frame known as the "car body legs" which protrudes about an inch beyond the track roller frame itself. Lammers' testimony and subsequent testimony overwhelmingly indicate that step number 3 refers to the top of the track roller frame guard and not to the "car body legs". Apparently, the jury was not confused and accepted the testimony of Lammers and others in this connection.