931 So.2d 400 (2006)
Mary Ann CRUM, et al., Plaintiffs-Appellants
v.
STATE of Louisiana, et al., Defendants-Appellees.
No. 41,059-CA.
Court of Appeal of Louisiana, Second Circuit.
May 17, 2006.
*401 Broussard, Bolton, Halcomb, & Vizzier, by Roy S. Halcomb, Jr., Alexandria, for Appellants.
Charles C. Foti, Jr., Attorney General, Jerald L. Perlman, Assistant Attorney General, for Appellees.
Before WILLIAMS, CARAWAY and LOLLEY, JJ.
CARAWAY, J.
This is a lawsuit against the State of Louisiana and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College through Louisiana State University Health Sciences Center at Shreveport ("LSUHSC"), seeking damages for the death of a patient. Plaintiffs' suit in district court alleged that LSUHSC caused the death by negligently performing a blood transfusion on the patient and by subsequently providing him with substandard medical care. Plaintiffs' claims had not been heard by a medical review panel prior to the filing of the lawsuit. The district court concluded that the plaintiffs' allegations of wrongdoing sounded in medical malpractice and were premature until considered by a medical review panel. Plaintiffs appeal from the judgment dismissing their tort action. We affirm.

Facts
According to the petition, Earnest Crum ("Crum") was admitted to the LSUHSC hospital in Shreveport on February 17, 2004, for a carotid arteriogram procedure. The procedure was performed the next day, after which Crum had a blood transfusion. Plaintiffs, the children of Crum, allege that he thereafter began to have severe complications from the transfusion that led to his transfer to intensive care and subsequent death on February 21, 2004. According to the petition, Crum's injuries and death were caused by:
a. Failing to type and cross match Crum's blood before giving him the blood transfusion in question;
b. Failing to timely and properly type and cross match Crum's blood before giving him the blood transfusion in question;
c. Failing to perform the testing necessary to discover that the donor blood given Crum was positive for the presence of JKA antigen and that Crum's blood was positive for the presence of JKA antibody;
d. Failing to correctly report the type and cross match testing of Crum's blood and the donor blood given Crum;
e. Giving Crum a blood transfusion using donor blood with JKA antigen which was incompatible with Crum's blood;
f. Failing to timely discover and treat Crum for the transfusion reaction;
g. Failing to timely obtain and give Crum blood after the transfusion reaction;
h. Failing to act with that degree of care required of a reasonably prudent health care provider with similar skills and education and faced with similar circumstances so as to avoid the kind of injuries suffered by Crum; and,
i. Failing to possess and / or properly exercise the degree of care ordinarily possessed and exercised by health care providers practicing within the same medical specialty and / or practicing in a similar community or local (sic) and under similar circumstances.
Simultaneously with the filing of this tort action in district court, plaintiffs also initiated a medical review panel proceeding against the defendants, making the same allegations of wrongdoing by the hospital. This record does not show that the review panel process has concluded, and clearly *402 the process had only just begun when the lawsuit was filed.
In the district court, the defendants filed exceptions of prematurity and lack of subject matter jurisdiction. The defendants urged that the tort action in district court was premature until the case had been considered by a medical review panel. After considering the arguments of counsel regarding the exceptions, the court concluded that the action was premature and dismissed the case without prejudice. Plaintiffs now appeal.

Discussion
From the pleadings and explanations of counsel, the blood that Crum received was not contaminated with a virus or any other inherently deleterious substance. Instead, the alleged cause of Crum's initial injury was his transfusion with blood containing the JKA antigen, a blood component that was incompatible with Crum's blood. Admittedly, blood containing the JKA antigen is compatible with the blood of many other patients in the general population whose blood does not contain JKA antibodies. Like the screening for blood compatibility which must occur to match a donor's blood type (e.g., A-positive or B-negative) with that of the patient, the screening process also routinely considers the appropriate match regarding the JKA antigen. That evaluation process allegedly failed in this case.
Defendants herein are the state and a state hospital, so the applicable law is the Medical Liability for State Services Act ("MLSSA"), La. R.S. 40:1299.39, et seq., and not the Medical Malpractice Act ("MMA"), La. R.S. 40:1299.41, et seq. In relevant part, La. R.S. 40:1299.39.1(A)(1)(a) provides:
All malpractice claims against the state, its agencies, or other persons covered by this Part ... shall be reviewed by a state medical review panel established as provided in this Section....
Additionally, La. R.S. 40:1299.39.1(B)(1)(a)(i) provides as follows:
No action against the state, its agencies, or a person covered by this Part, or his insurer, may be commenced in any court before the claimant's complaint has been presented to a state medical review panel established pursuant to this Section.
These provisions thus require that a litigant present his medical malpractice complaint against the state and state agency to a medical review panel prior to proceeding in district court with a medical malpractice claim. See Derouen v. State, Dept. of Health and Hospitals, 98-1201 (La.App. 3d Cir.2/3/99), 736 So.2d 890. In the absence thereof, the exception of prematurity will be granted.
The definition of "malpractice" in the MLSSA has been changed several times over the life of the statute. See, Vernon v. E.A. Conway Hospital, 33,105 (La.App. 2d Cir.4/5/00), 756 So.2d 1249, writ denied, 00-1302 (La.6/16/00), 765 So.2d 342. The MLSSA's definition under section 40:1299.39(A)(4) presently lists the definition as follows:
"Malpractice" means the failure to exercise the reasonable standard of care specified and required by Subsection B of this Section[1], in the provision of health care, when such failure proximately *403 causes injury to a patient, as provided in Subsection B of this Section.
"Health care" is defined in La. R.S. 40:1299.39(A)(6) as:
"Health care" means any act or treatment which was performed or furnished or which should have been performed or furnished by any person covered by this Part for, to, or on behalf of, a patient during the medical care, treatment or confinement of the patient.
The definition of malpractice in the MLSSA differs from the definition in the MMA, which is found in La. R.S. 40:1299.41(A)(8):
(8) "Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.
(Emphasis added.) Under the MMA definition for malpractice, with its provision for defects in blood, the jurisprudence has required such claims to be presented to a medical review panel. Johnson v. Glenwood Regional Medical Center, 38,614 (La. App. 2d Cir.6/23/04), 877 So.2d 241; Webre v. Hospital Service District. No. 1, 00-0926 (La.App. 1st Cir.6/22/01), 798 So.2d 176; DeBlanc v. Touro Infirmary, 96-1965 (La.App. 4th Cir.12/27/96), 686 So.2d 1015; Sonnier v. Opelousas General Hosp., 95-1560 (La.App. 3d Cir.5/8/96), 688 So.2d 1040; Landry v. Ochsner Foundation Med. Center, 95-883 (La.App. 5th Cir.2/27/96), 671 So.2d 24.
As reviewed in Vernon, supra, the MLSSA definition of malpractice in the 1970's also once covered all legal responsibility arising from defects in blood. As originally enacted by 1976 La. Acts 66, § 1, the MLSSA defined malpractice as "any tort or breach of contract based on health care or professional services rendered or which should have been rendered to a patient by a person covered by this Part." By 1976 La. Acts 660, this definition was amended to include "such legal responsibility of a health care provider arising from defects in blood. ..." (Emphasis added). However, 1978 La. Acts 611, § 1 deleted any reference to blood and redefined malpractice as "any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient."[2]
Because of this legislative history for the MLSSA and, in particular, the deletion of the coverage for defective blood from the malpractice definition in 1978, plaintiffs now argue that this case falls outside the MLSSA and its requirement of review by a medical review panel. Plaintiffs rely on the holdings in Vernon, supra and Doe v. Medical Center of Louisiana, 612 So.2d 1050 (La.App. 4th Cir.1993), writ denied, 613 So.2d 1005 (La.1993). Those cases involved claims of patients injured by blood that was inherently defective due to contamination with a virus. The patients successfully argued that the legal responsibility for the improper screening of that defective blood was not included within the definition of malpractice in the MLSSA *404 and thus the state was not entitled to a medical review panel prior to the commencement of a lawsuit in district court.
A review of the history of Louisiana law and jurisprudence shows that in 1976, when Act 660 amended the MLSSA's definition of malpractice to include the providing of defective blood, a hospital could be held liable under the strict tort product liability theory. DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981). DeBattista dealt with blood infected by the hepatitis virus and found it "defective, i.e., unreasonably dangerous to normal use. The risks involved in receiving a transfusion of blood in this condition are certainly greater than a reasonable consumer would expect." Id. at 31. With this understanding of the meaning of defective blood at the time of the 1976 and 1978 amendments to the MLSSA, the blood in question would never have been considered defective because it could serve the needs of many patients whose blood would not react to the JKA antigen. It was not dangerous for normal use. The only damage brought about by this blood resulted because of the alleged negligent employment of its use for a patient whose blood was incompatible. Therefore, like the trial court, we hold that the alleged failure to properly type Crum's blood for transfusion presents a health care question rather than a case of defective blood products, such as blood infected with the HIV virus.
In Coleman v. Deno, 01-1517, 01-1521 (La.1/25/02), 813 So.2d 303, the supreme court, applying the MMA, considered the following factors in determining whether a particular act constituted malpractice or an ordinary tort action:
(1) whether the particular wrong is "treatment related" or caused by a dereliction of professional skill,
(2) whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,
(3) whether the pertinent act or omission involved assessment of the patient's condition,
(4) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,
(5) whether the injury would have occurred if the patient had not sought treatment, and,
(6) whether the tort alleged was intentional.
Applying these factors by analogy for an understanding of "malpractice" and "health care" under the MLSSA, the allegations in this case fall within the category of malpractice. The alleged failure of the provider to fully type Crum's blood is an allegation of the dereliction of professional skill. Expert medical evidence will be required to determine whether the alleged failure to type the patient's blood led to his injury and death. Plaintiffs alleged that the provider failed to assess Crum's condition both prior to the transfusion (by failing to type his blood) and afterwards (by failing to timely discover and treat Crum for the transfusion reaction). The alleged injuries were within the scope of the health care relationship, and the transfusion reaction would not have occurred had Crum not sought treatment. Thus, under the Coleman analysis, the suit presents medical malpractice claims.

Conclusion
Accordingly, with the MLSSA and its medical review process applicable in this case, the judgment of the trial court granting the exception of prematurity is hereby affirmed at appellants' cost.
AFFIRMED.
NOTES
[1] La. R.S. 40:1299.39(B) provides, in part:

(B)(1) The standard of reasonable care specified and required by this Section is as follows: The standard of care specified and required by this Section for licensed physicians and dentists shall be the same as that required to be proven with respect to them under the provisions of La. R.S. 9:2794.
[2] The present definition of malpractice was added by 1988 La. Acts 786, § 1.