503 So.2d 1122 (1987)
Michael BROWN, Individually and As Natural Tutor of the Minor Child, Marcus Brown, Plaintiff-Appellee-Appellant,
v.
SEARS ROEBUCK & COMPANY, et al., Defendants-Appellants-Appellees,
Michael and Jolene Brown, Third Party Defendants-Appellees.
No. 86-278.
Court of Appeal of Louisiana, Third Circuit.
March 4, 1987.
Writs Granted May 15, 1987.
*1123 Plauche, Smith and Nieset (Allen L. Smith, Jr., and Frank Walker Jr., Lake Charles, for defendants-appellants-appellees.
Robert W. Diggs, of Domengeaux and Wright, for plaintiff-appellee-appellant.
Davidson, Meaux, Sonnier & Roy, John E. McElligott, Lafayette, for third party defendants-appellees.
Before GUIDRY, STOKER and LABORDE, JJ.
GUIDRY, Judge.
This is a tort action brought by Michael Brown, in his own behalf and on behalf of his minor son, Marcus Brown, for personal injuries allegedly sustained by Marcus while riding on an escalator in a Sears, Roebuck department store. Made defendants in the suit were Sears, Roebuck and Company (Sears), the owner of the escalator, and Westinghouse Electric Corporation (Westinghouse), the manufacturer of the escalator.[1] Sears filed a third party demand against Jolene Brown, mother of the injured child, and Westinghouse.[2] Westinghouse, in turn, filed a third party demand against Michael and Jolene Brown for indemnity and/or contribution.
The matter was tried to a jury. At the conclusion of the trial, all parties moved for *1124 directed verdicts on the issue of liability. The trial judge granted plaintiff's motion for a directed verdict, finding Sears and Westinghouse liable in solido and dismissing their third party claims against Michael and Jolene Brown. This left only the issue of damages to be decided by the jury. The jury awarded plaintiff $4,163.47 in special damages (medical expenses) and $1,500.00 in general damages. Plaintiff subsequently moved for an additur or, alternatively, for a new trial, both of which were denied by the trial judge. Judgment was rendered in accordance with the jury verdict against Sears and Westinghouse, in solido. All parties have appealed.
Sears and Westinghouse urge on appeal that the trial court erred in granting plaintiff's motion for a directed verdict on the issues of the legal liability of Sears, Westinghouse and Jolene Brown instead of letting the jury decide those issues. Plaintiff appeals the jury's award of general damages, urging that the $1,500.00 award in general damages is so low as to be unconscionable.

FACTS
On June 22, 1982, Jolene Brown, Marcus Brown (nearly two years old at the time), and Jolene's cousin, Sapha Marie Charles, were shopping at the Sears, Roebuck department store in the Acadiana Mall in Lafayette. The three decided to go to the second floor and boarded the store's escalator. Jolene and Marcus stepped onto the escalator together, with Marcus standing on Jolene's left. Jolene held Marcus' right hand in her left hand and placed Marcus' left hand on the escalator handrail. Sapha followed a few steps behind the pair. During the escalator's ascent to the second floor, Marcus suddenly stooped down and placed the little finger of his left hand into the air space separating the moving tread from the left sidewall of the escalator, causing a severe laceration of his little finger. Jolene was not aware of Marcus' actions until he screamed, whereupon she found him standing up holding his bleeding finger. Sapha testified at trial that she had noticed the child's finger caught in the air space, but that she didn't really know that anything was wrong until Marcus screamed and showed them his finger. Marcus was taken to the hospital where he later underwent surgery to repair a severed tendon.
It was established at trial that Sears was the owner of the escalator and Westinghouse was the manufacturer. Westinghouse also installed the escalator and was responsible for its maintenance and repair. Jerry Dwight Mowdy, a local representative for Westinghouse, was qualified at trial as an expert in the field of elevator and escalator maintenance and repair. Mowdy testified that the escalator in question had been inspected on June 15, 1982, just seven days prior to the accident. Mowdy also testified that he had personally inspected the escalator just prior to trial, approximately three years after the accident, and found that the air spaces between the steps and sidewalls were within the requirements set by the American National Standards Institute Code for escalators. The ANSI standards provide that the air space cannot exceed three-sixteenths of an inch. Mowdy testified that the standards set by Westinghouse require that the space be set at one-eighth of an inch upon installation of the escalator. Mowdy's inspection in October of 1985 revealed that the air space did not exceed three-sixteenths of an inch at any point on the escalator. Mowdy then explained the purpose for the air space as follows:
"That space is a running clearance for the steps. If there was no space, the steps couldn't move. If that step was up tight against some solid object, you would create a friction and, thusly, not allow the steps to move. So you would not have a running escalator. You would have a set of stairs."
Mowdy also testified that the escalator in question contained yellow caution decals located on either side of the handrails at the entrance to the escalator, in accordance with the ANSI standards. The decals read:
 "CAUTION
 Hold Handrail
 Attend Children
*1125
 Avoid Sides
 CAUTION"
Pictured on each decal is a woman and a child riding on an escalator. The woman is depicted holding on to the right handrail with her right hand and holding the child's hand with her left. The four areas emphasized in the picture by circles are the woman's hand on the handrail, the woman and child holding hands and the two air spaces between the steps and the left and right sidewalls.
Aaron Hollier, the visual merchandise manager at Sears, testified that Sears provides two additional placards which contain warnings to its escalator users. One of the placards is mounted on the wall of the escalator well and can be seen as you travel up the escalator. The other placard is located on a floor stand at the entrance to the escalator and is moved daily for cleaning purposes. Both of these signs read:
 "CAUTION
 ATTEND CHILDREN
 NO BARE FEET
 NO STROLLERS ON ESCALATORS
 USE ELEVATOR IN APPLIANCE
 DEPT."
Hollier could not say for certain whether these signs were up on the date of the accident, but simply stated, "[t]o the best of my knowledge they've been up every day since we put them up in 1979". However, Jolene and Sapha testified that neither the floor sign nor the wall-mounted sign were present on June 22, 1982, the date of the accident.

LIABILITY
Appellants, Sears and Westinghouse, contend that the trial court erred in granting plaintiff's motion for directed verdict on the issues of the legal liability of Sears and Westinghouse and of the negligence of Jolene Brown. Appellants assert that by so doing, the trial court improperly imposed a rule of absolute liability upon Sears, as the owner of the escalator, and Westinghouse, as the manufacturer of the escalator. Appellants also urge that the issue of Jolene Brown's fault in causing or contributing to the accident should have been placed before the jury for a decision.
The standard of proof to be used by a trial judge in deciding a motion for a directed verdict in jury cases is whether the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary verdict. Campbell v. Mouton, 373 So.2d 237 (La. App. 3rd Cir.1979), appeal after remand, 412 So.2d 191 (La.App. 3rd Cir.1982), writ denied, 415 So.2d 954 (La.1982); Theriot v. St. Martin Parish School Board, 434 So.2d 668 (La.App. 3rd Cir.1983). The trial judge has much discretion in determining whether or not a motion for a directed verdict should be granted. Broussard v. Missouri Pacific Railroad Company, 376 So.2d 532 (La.App. 3rd Cir.1979).
In granting plaintiff's motion for a directed verdict, the trial judge relied upon the Supreme Court cases of Marquez v. City Stores Co., 371 So.2d 810 (La.1979), and Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980); and, the Fourth Circuit case of Shapiro v. City Stores Co., 391 So.2d 2 (La.App. 4th Cir.1980). We examine these cases in light of the facts of the instant case to determine whether the trial judge abused his discretion in granting the directed verdict in favor of the plaintiff on the issue of the liability of Sears and Westinghouse.
In Marquez v. City Stores Co., supra, a three and one-half year old child sustained injury on an escalator at a Maison Blanche department store in New Orleans when his tennis shoe got caught in the space between the escalator's moving steps and the sidewall. Because of the injury, the child had to undergo surgical amputation of the big toe of his left foot. There was no evidence that the child was misbehaving on the escalator or using it in any manner other than its normal and intended use. The evidence also indicated that the space in which the child's shoe got caught was well within the national standards for safe escalator construction.
The trial court found in favor of the child's father and against the store and its *1126 insurer but dismissed the father's demand against the manufacturer of the escalator. On appeal, the Fourth Circuit reversed the ruling of the trial court, finding that the store and its insurer were not liable under either a tort or a strict liability theory.[3] The Supreme Court reversed the ruling of the Court of Appeal and reinstated the judgment of the trial court. Citing Loescher v. Parr, 324 So.2d 441 (La.1975), the Supreme Court stated that to establish the liability of a defendant under La.C.C. art. 2317, a plaintiff must prove three things: (1) the thing was in defendant's custody; (2) the thing had a vice or defect; and, (3) the injury or damage was caused by the vice or defect. As it was undisputed that the escalator was in the custody of Maison Blanche (City Stores Co.), and that the Marquez child was injured by the escalator, the sole issue became whether the escalator was defective. In determining that the escalator was defective, the Supreme Court stated:
"... The fact that this escalator caught this child's shoe is an unusual occurrence in itself which would not have happened had this escalator not been defective. Ott v. J.C. Penney Co., 360 So.2d 524 (La.App.1978); Tarantino v. City Stores Co. (Maison Blanche division), 278 So.2d 149 (La.App.1973), writ denied 281 So.2d 741 (La.1973).
. . . . .
... If this escalator were safe for small children with small feet, then James' shoe could not have been caught in this opening."
The court also concluded that the fact that the air space fell within the requirements of the national standards was "insufficient to rebut the inference that there was a vice or defect in this escalator which caused an unreasonable risk of harm to another". No negligence was found on the part of the child's father in the supervision of his son on the escalator.
In the factually similar case of Hunt v. City Stores, Inc., supra, a twelve year old boy injured his knees on an escalator when his right tennis shoe got caught in the space between the escalator's moving tread and its left side panel. Again, there was no evidence of misbehavior on the part of the boy. The space between the moving treads and the escalator's side panel was also within the standards permitted by the National Safety Code for escalators.
The trial court rendered judgment in favor of plaintiff and against City Stores, Inc., but dismissed his demand against the manufacturer, Otis Elevator Company. On appeal, the Fourth Circuit affirmed, asserting that the Marquez case controlled the result. The Supreme Court affirmed the lower court's decisions as to City Stores, Inc., but held Otis Elevator Company to be solidarily liable with City Stores, Inc.[4]
In support of its decision, the Supreme Court relied upon its prior ruling in Marquez to establish liability on City Stores, Inc., the owner of Maison Blanche. In balancing the probability and magnitude of the risk inherent in the escalator against the utility of such, the court held,
"While the escalator was beneficial and convenient to Maison Blanche and its customers, the utility of its condition on May 27, 1976, was outweighed by the hazard to small children associated with its use...."
The court went on to stress the necessity for warning signs on the escalator as follows:
"This escalator posed a threat to small children in tennis shoes. City Stores was aware of the danger and had a duty to *1127 warn of the risk of injury. It failed to do so. The store was at fault in not guarding the public against the risk of harm posed by the escalator."
The Supreme Court then set forth the rule of strict liability for manufacturers of defective products as established in Weber v. Fidelity & Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971). Under Weber, the plaintiff must prove that (1) the product was defective, i.e., unreasonably dangerous in normal use; (2) the product was in normal use at the time of the injury; (3) the product's defect caused the injury; and, (4) the injury might reasonably have been anticipated by the manufacturer. The court then balanced the gravity of harm against the benefits and utility of the escalator in determining that it should be classified as "unreasonably dangerous". The court stated that, "[t]he escalator was shown to present an unreasonable risk of harm in normal use which could have been anticipated by the manufacturer". It was then noted that defendants had failed to prove either victim fault or fault of a third person which would have relieved them from liability. The court in Hunt also stressed the importance of warning signs and noted that, although the escalator did contain a warning against bare feet, it failed to warn of the hazard posed to children clad in tennis shoes.
In Shapiro v. City Stores Co., supra, the Fourth Circuit Court of Appeal was faced with a factual situation considerably different from those presented in Marquez and Hunt. In Shapiro, a five-year old boy injured his arm when it apparently got caught in the mechanism of the moving rubber handrail of an escalator at a Maison Blanche store in Metairie. Unlike Marquez and Hunt, the child sustained his injuries not while riding on the escalator, but rather while playing around the entrance to the first floor escalator. The child's mother was looking at merchandise on a display table some ten feet away from the escalator when the accident occurred.
Plaintiff, in Shapiro, filed suit against the owner of Maison Blanche, the manufacturer of the escalator, and their respective insurers. The trial court rendered judgment against plaintiff, dismissing his suit against all defendants. On appeal, the Fourth Circuit rejected the arguments of defendants that the accident did not occur as the result of any normal or intended use of the escalator and was solely the result of the mother's negligence in permitting the child to play near the escalator instead of watching him more closely. The court stated that:
"... It is difficult for us to say that any person in such close proximity to the escalator had no business being there or that their presence there was unexpected or unusual. If the escalator was in fact defective, i.e. posed a potential hazard to small children, then we consider the resulting injuries to have occurred within the context of normal and intended use."
The court found that the mother was not guilty of contributory negligence due to the close proximity of the child to his mother and the relative closeness of the display table to the escalator. The court thereafter concluded, based upon the prior holdings in Marquez and Hunt, that the escalator was in fact defective and held the store owner and escalator manufacturer liable in solido.
The crux of appellants' argument on appeal rests on the recent Supreme Court case of Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). Appellants argue that by granting the plaintiff's motion for a directed verdict, the trial judge took away from the jury its function of determining whether the escalator in question met and passed the risk-utility test as set forth by the Supreme Court in Halphen. Ironically, it is specifically because of the language of the Supreme Court in Halphen that we feel compelled to affirm the trial court's actions in the present case.
In Halphen, the Louisiana Supreme Court responded to the following certified question from the U.S. Fifth Circuit Court of Appeal:
"In a strict products liability case, may a manufacturer be held liable for injuries caused by an unreasonably dangerous product if the manufacturer establishes *1128 that it did not know and reasonably could not have known of the inherent danger posed by its product? Halphen v. Johns-Manville Sales Corp., 752 F.2d 124, 755 F.2d at 393 (5th Cir.1985) (en banc)."
In an effort to fully and completely answer the question, the Supreme Court set out to categorize and discuss the various theories of products liability which have developed over the years in Louisiana, with special emphasis on the relevance of the knowledge available to the manufacturer.
At the outset, the Supreme Court discussed products which are "unreasonably dangerous per se". The court recognized this as a separate class of defective products because liability for such "may be imposed solely on the basis of the intrinsic characteristics of the product irrespective of the manufacturer's intent, knowledge or conduct". The court noted that this category of products gives rise to the "purest form of strict liability".
The Supreme Court thoroughly discussed the classification of products as "unreasonably dangerous per se" as follows:
"A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product.2 Hunt v. City Stores, Inc., 387 So.2d 585 (La. 1980); cf. Entrevia v. Hood, 427 So.2d 1146 (La.1983); Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133, 140 (1971). See Elmore v. Owens-Illinois, Inc., 673 S.W.2d 434 (Mo.1984); Turner v. General Motors Corp., 584 S.W.2d 844 (Tex.1979); Carter v. Johns-Manville Sales Corp., 557 F.Supp. 1317 (E.D.Tex.1983); Prosser and Keeton on Torts, p. 699 (5th Ed.1984); Keeton, Torts, Annual Survey of Texas Law, 1981, 35 Sw.L.J. 1, 9 (1981); Keeton, The Meaning of Defective in Products Liability Law, 45 Mo.L.Rev. 579, 592 (1980). This theory considers the product's danger-in-fact, not whether the manufacturer perceived or could have perceived the danger, because the theory's purpose is to evaluate the product itself, not the manufacturer's conduct. Likewise, the benefits are those actually found to flow from the use of the product, rather than as perceived at the time the product was designed and marketed. The fact that a risk or hazard related to the use of a product was not discoverable under existing technology or that the benefits appeared greater than they actually were are both irrelevant. Hunt v. City Stores, Inc., supra; Keeton, The Meaning of Defect, supra, p. 595; Keeton, Products LiabilityInadequacy of Information, 48 Tex.L.Rev. 398, 407-408 (1970). Under this theory, the plaintiff is not entitled to impugn the conduct of the manufacturer for its failure to adopt an alternative design or affix a warning or instruction to the product. A warning or other feature actually incorporated in the product when it leaves the manufacturer's control, however, may reduce the danger-in-fact. If a plaintiff proves that the product is unreasonably dangerous per se, it is not material that the case could have been tried as a design defect case or other type defect case." (Emphasis ours; footnote omitted).
We find it extremely noteworthy that the Supreme Court cited the Hunt case (not once but twice) during its discussion of products which are "unreasonably dangerous per se". In so doing, we believe our Supreme Court determined that all escalators fall under the category of products which are "unreasonably dangerous per se". Likewise, the court listed noxious gases, as found in Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971), as unreasonably dangerous per se, as compared to the defective steps on a rural, vacant, abandoned farmhouse as found in Entrevia v. Hood, 427 So.2d 1146 (La.1983), which the court determined did not pose an unreasonable risk of harm.
Although appellants properly cite Halphen as requiring a risk-utility test for determining whether a product is unreasonably dangerous, such test is unnecessary in the instant case as the Supreme Court has already made a judicial determination that in cases involving escalators, the utility of *1129 the product is outweighed by the hazard posed to small children. Hunt, supra.
In discussing the societal and economic goals at the foundation of our strict products liability law, the Supreme Court stated that,
"... as between an innocent consumer injured by a product which is unreasonably dangerous per se, i.e., too dangerous to be placed on the market, and the manufacturer who puts the product into commerce without being aware or able to know of its danger, the manufacturer must bear the cost of the damage caused by its product. On the other hand, if the consumer fails to prove that the product is unreasonably dangerous per se and seeks to prove his case by impugning the manufacturer's conduct, e.g., by contending that the manufacturer failed to warn or to adopt feasible alternative designs, in fairness the manufacturer should be permitted to introduce evidence and present argument as to the standard of knowledge and conduct by which its conduct is to be judged."
The court went on to hold that,
"... when a plaintiff proves that a product is bad and defective because its utility is outweighed by its danger-in-fact, i.e., unreasonably dangerous per se, and the plaintiff proves this theory of recovery without impugning the conduct of the manufacturer, the producer should be held strictly liable regardless of scientific inability to know or to avoid the danger.
. . . . .
... We conclude that recognizing an unreasonably dangerous per se category as a form of "pure" strict liability along with construction or manufacturing defects will provide even greater incentives to produce safe products."
In light of the specific directives of the Supreme Court as set forth in Halphen, we can only conclude that the trial court did not err in granting plaintiff's motion for a directed verdict on the issue of the liability of Sears and Westinghouse. Having determined that the escalator in question was unreasonably dangerous per se, the appellants' only means of escape from liability was to establish that the harm to Marcus Brown was occasioned as the result of either his own fault, the fault of a third person or by an irresistible force.[5] As Marcus Brown was not even two years old at the time of the accident, he is exempted from any finding of fault on his part. Nor do we find that the accident resulted due to the fault of a third person. Although appellants urge that Jolene Brown's own negligence in failing to properly supervise her young child was the cause of his resultant injury on the escalator, we find absolutely no merit to this argument. Jolene placed Marcus' left hand on the handrail and held on to his right hand. The fact that she did not continuously watch Marcus as they went up the escalator to the second floor certainly cannot be considered as substandard conduct and no reasonable person could determine otherwise. For these reasons, we conclude that the trial court properly granted plaintiff's motion for a directed verdict.

QUANTUM
In answer to the appeal, plaintiff argues that the jury's general damage award of $1,500.00 was so low as to be unconscionable, and therefore, the trial judge should have granted his motion for an additur.
Following the accident, Marcus was taken to Lafayette General Hospital where he was examined by Dr. James Hugh Larriviere. Dr. Larriviere found that Marcus suffered a laceration of the little finger of his left hand which caused the tendon to retract into his palm. X-rays revealed that Marcus did not suffer any fracture or dislocation of the finger. Surgery was performed on the finger to repair the damaged *1130 tendon.[6] Following surgery, Marcus' left arm was placed in a cast from the elbow down. Marcus spent two nights in the hospital and then returned home to the care of his mother. Dr. Larriviere testified that Marcus tolerated the surgical procedure well.
Dr. Larriviere examined the finger approximately a week later. At this time, the cast on Marcus' arm was found to be broken in several places and Dr. Larriviere was alarmed that because of this the finger had not remained properly immobilized. Upon examination of the wound, Dr. Larriviere found that the finger was still viable and that the skin looked fairly good. The finger was thereafter placed in an aluminum splint.
Dr. Larriviere continued to treat Marcus on a regular basis thereafter. Approximately a month after the accident, Dr. Larriviere noticed that the injured finger had a slight flexion deformity, in that, the finger did not bend properly. Marcus was then placed in a smaller splint which his mother was allowed to remove for his baths.
By July 29, 1982, Dr. Larriviere noted that the skin laceration was well healed. Proper flexion had returned to the middle joint of his little finger, but he was still unable to bend the last joint (the tip of the finger). Dr. Larriviere then sent Marcus to physical therapy so that he could work on regaining full motion of his injured finger. Marcus underwent physical therapy from July 29, 1982 through December 1, 1982.
By September 9, 1982, Marcus was no longer wearing the aluminum splint which Dr. Larriviere had given him, but instead was wearing a little "outrigger" splint which the physical therapist had placed on his finger. The purpose of this splint was to allow Marcus to gradually extend his finger and build up its strength. Dr. Larriviere noted that the extension of the finger was improving and the tendon was apparently still intact. The wound was noted to be completely healed at this time.
On October 7, 1982, Dr. Larriviere again examined Marcus and found improved motion and flexion in the little finger. Although Marcus still had a little flexure contracture of the distal joint of his finger, Dr. Larriviere suggested that Marcus decrease the physical therapy session and just concentrate on getting as much motion from the finger as possible.
Dr. Larriviere's last examination of Marcus took place on January 11, 1983. At this time, it was found that Marcus' little finger still had some flexion contracture of the distal joint, but that Marcus was moving it fairly well. Marcus had no complaints of pain at this time. Marcus was then discharged from Dr. Larriviere's care and told to return if he experienced any future problems with the finger. Marcus was never brought back to see Dr. Larriviere.
Dr. Larriviere testified at trial that, although Marcus would probably continue to have a little flexure contracture at the tip of his little finger, he would nonetheless be able to function satisfactorily with his hand. Other than this problem with the tip of his finger, Marcus suffered no other problems with the rest of his little finger or his hand. Dr. Larriviere surmised that Marcus would not need any further surgery in the future.
On May 3, 1983, Marcus was examined by Dr. Terry A. Cromwell, a plastic surgeon in Lafayette. Dr. Cromwell testified through video deposition that he found no flexion in the distal joint of the little finger of Marcus' left hand. Dr. Cromwell attributed this to either a disruption in the tendon repair, possibly caused by a lack of immobilization of the hand, or due to the scar tissue around the injury. Dr. Cromwell noted that there were no complaints of pain by Marcus upon examination and that Marcus' mother had told him that he was able to use his left hand very well and was not hampered in his activities.
*1131 Dr. Cromwell's prognosis for Marcus was good. Dr. Cromwell stated that if Marcus were to develop future problems with his finger, two operative procedures would possibly be necessary. However, Dr. Cromwell opined that there was no reasonable probability that Marcus would need any future reconstructive surgery. He stated that surgery would not be indicated considering the small amount of function which the child had lost in his finger. Dr. Cromwell did state that according to the American Medical Association Impairment Values, Marcus' loss of use of the last joint on his little finger left him with a 45% impairment of the finger, a 2% impairment of his left hand, and a 2% impairment of his upper extremity. However, Dr. Cromwell observed that, in his experience, the loss of use of this joint does not tend to really inhibit the use of the hand. He also stated that most children of such a young age have a remarkable ability to accommodate to such an injury and would probably learn to use the injured hand for just about anything that he pursued.
Jolene Brown testified at trial regarding her son's condition. She stated that Marcus would get very frightened every time he had to go to either the doctor or the physical therapist and that he would scream whenever someone touched his injured finger. Jolene testified that, although Marcus could not straighten his little finger, she would probably not consider further surgery because she didn't want to put Marcus through any further suffering and pain. There was no testimony as to any specific limitations which the injury placed on Marcus' daily activities, or any testimony regarding any continued pain.
In light of the individual facts and circumstances of the instant case, we find that the jury's award of $1,500.00 in general damages is lower than the lowest award reasonably within the discretion afforded the trial court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Marcus Brown, less than two years of age at the time of the accident, sustained a severe laceration to his little finger, necessitating surgery to repair a severed tendon. Marcus remained under a doctor's care for six months following the surgery and underwent physical therapy during four of those six months. There was testimony by Jolene Brown that young Marcus was extremely frightened whenever he went to either the doctor or the physical therapist and would become quite upset during these visits. Although there was no evidence that Marcus continues to suffer from the injury or that the injury has restricted his activities in any notable fashion, we find that the ordeal which this child of such tender years underwent for six months was quite substantial. Additionally, Marcus will have a permanent disability of his left little finger which, albeit not serious, will undoubtedly be a source of bother for years to come.
For the above reasons, we will raise the general damage award from $1,500.00 to $3,000.00, which we consider to be the lowest amount reasonably within the discretion afforded the trier of fact.
Accordingly, the judgment of the trial court is amended to increase the general damage award to plaintiff to the sum of $3,000.00. In all other respects, the judgment of the trial court is affirmed. All costs on appeal are to be borne by defendants-appellants, Sears, Roebuck and Company and Westinghouse Electric Corporation.
AMENDED AND AFFIRMED.
NOTES
[1] Allstate Insurance Company and Insurance Company of North America were also made defendants in the instant suit, however, Insurance Company of North America was dismissed from the suit prior to trial on the merits and Allstate Insurance Company was dismissed upon plaintiff's motion during trial.
[2] During the course of the trial, Sears dismissed its third party demand against Westinghouse.
[3] Since the plaintiff in Marquez only answered the appeal of the store owner and its insurer, and failed to take his own appeal, the Court of Appeal ruled that he was unable to secure any relief against the manufacturer of the escalator, as that judgment had become final in the latter's favor.
[4] The Supreme Court disposed of the apparent conflict between the Marquez decision and their decision in Hunt, regarding the manufacturer's liability, in that, in Marquez, the demands against the manufacturer were based solely on the negligent performance of a maintenance contract, whereas, in Hunt, there were specific allegations as to the manufacturer's failure to design and manufacture the escalator in a reasonably safe manner in addition to failing to warn of the possible dangers of the escalator.
[5] We conclude from the language of the court in Halphen, supra, that warning signs, although reducing the danger of injury, do not serve to exculpate the owner and/or manufacturer of a product determined to be unreasonably dangerous per se.
[6] There is some discrepancy in the record as to the length, in time, of the surgery. Dr. Larriviere testified that the surgery lasted approximately 45 minutes. Jolene Brown stated that Marcus spent 2½ to 3 hours in surgery.