539 So.2d 696 (1989)
Rickey Lynn ANTLEY Sr., Plaintiff-Appellant,
v.
YAMAHA MOTOR CORPORATION, U.S.A., et al., Defendants-Appellees.
No. 87-1172.
Court of Appeal of Louisiana, Third Circuit.
February 8, 1989.
Rehearing Denied March 8, 1989.
*697 Chris J. Roy, Law Corp., Leslie R. Leavoy, Alexandria, for plaintiff-appellant.
Charles W. Seaman, Natchitoches, for intervenor-appellant.
A.J. Gregory, Jr., Natchitoches, Wilson & Walker, and Gold, Simon, Weems, Bruser, Sharp, Sues & Rundell, Raymond L. Brown, Jr., Alexandria, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Donald O. Collins, Vivian L. Madison, New Orleans, for defendants-appellees.
*698 BEFORE GUIDRY, KNOLL and KING, JJ.
GUIDRY, Judge.
On July 10, 1984, Rickey Lynn Antley, Jr. (hereafter Rickey), a seven and one-half year old boy, was killed when the Yamaha YTM225DXL all-terrain vehicle (hereafter ATV 225) he was riding capsized and fell upon him. The accident occurred in Natchitoches Parish, Louisiana. Rickey's natural father, Rickey Lynn Antley, Sr. (hereafter Antley, Sr.), timely filed suit seeking recovery for the deceased's wrongful death against Mr. and Mrs. Jimmy Warford and their insurer, Allstate Insurance Company (hereafter Allstate), for alleged negligence on the part of Mrs. Warford in permitting Rickey to ride the ATV 225; and against Yamaha Motor Corporation, U.S.A. (hereafter Yamaha), the manufacturer of the ATV 225. Jeri Antley Norman, Antley, Sr.'s former wife and Rickey's natural mother, intervened seeking damages for the wrongful death of her son. Antley, Sr. subsequently amended his petition to include Cane River Cycles, Inc., d/b/a Honda Village, as a defendant.[1] Numerous cross-claims and third-party demands were filed but all were dismissed before trial.
Prior to trial, the Warfords and Allstate settled with the plaintiff and intervenor and the latters' demands against these defendants were dismissed. Thereafter, the matter proceeded to trial by jury against the remaining defendants, Yamaha and Cane River Cycles, Inc. The jury unanimously found Yamaha and Antley, Sr. each 50% at fault in causing Rickey's death. The jury found no negligence on the part of the Warfords, Ed Stewart, and/or Cane River Cycles, Inc. The jury awarded Jeri Antley Norman $50,000.00 in damages but found that Antley, Sr. suffered no damages. Pursuant to this verdict, the trial court rendered judgment in favor of Jeri Antley Norman against Yamaha in the amount of $50,000.00 together with interest from date of judicial demand until paid. Antley, Sr.'s claims against Yamaha and Ed Stewart, d/b/a Cane River Cycles, Inc. were dismissed. Yamaha and Antley, Sr. were cast with all costs of the proceedings. Yamaha filed a motion for a new trial. Antley, Sr. filed a motion for judgment notwithstanding the verdict and, in the alternative, for a new trial. The trial court denied all post-trial motions. Plaintiff and intervenor appealed devolutively, however, intervenor's appeal was dismissed upon her own motion. Defendant, Yamaha, answered Antley, Sr.'s appeal urging that if the trial court judgment is revised or reversed then, in such event, Yamaha is entitled to have such judgment revised to additionally cast judgment against Beverly Warford and Antley, Sr., in solido, for the full amount of Jeri's damages. Yamaha also seeks a reversal of the trial court judgment insofar as its casts Yamaha 50% negligent in causing Rickey's death.

FACTS
In July 1984, Rickey was living with his mother, Jeri Norman, in Longview, Texas. From time to time Rickey would visit with his father and his paternal grandparents in Natchitoches, Louisiana. On this particular occasion young Rickey had come to Natchitoches to attend the funeral of his great-aunt. He was staying with his grandfather, Floyd Antley, who was the next door neighbor of the Warfords. When Rickey would visit his grandfather, he often played with the Warfords' nine year old son, Keith.
On July 9, 1984, Rickey sought and received permission from his father and his grandfather to spend the night with Keith at the Warford home. On the morning of July 10, 1984, Mrs. Warford took her son Keith to swimming lessons, and Rickey accompanied them. They later returned to the Warford residence, had lunch, and then met Rickey's father and some other people at the movie theater. At the end of the movie, Mrs. Warford, Keith and Rickey returned to the Warfords. Rickey's father and stepmother went to their house, decided *699 to see another movie, and attempted to contact the Warfords to ascertain whether or not Mrs. Warford, Keith and little Rickey wanted to join them. They received no answer to their telephone call. The Antleys then went to the movie theater alone.
At about that same time, Mrs. Warford was bathing another one of her children and preparing dinner. She had instructed the two boys to check in with Rickey's grandfather. Mrs. Warford remembered that Rickey and Keith were looking for the key to the ATV 225, and upon finding the key, they left the house. Presumably, Rickey got on the ATV 225, started it and proceeded down a dirt and gravel road, ostensibly to check in with his grandfather. Within minutes John LeVasseur, who was driving in the area, found the ATV 225 lying on its left side on top of little Rickey. There were no signs of life. Other individuals came to the scene and Rickey was rushed to the hospital. He was pronounced dead in the emergency room. There were no eyewitnesses to the accident.
The ATV 225, being operated by Rickey, was manufactured by Yamaha in 1984 and sold to Jimmy Warford by Cane River Cycles, Inc. The ATV 225 is one of the larger model all-terrain vehicles manufactured by Yamaha and is capable of attaining speeds in excess of 50 miles per hour. It was designed primarily as an off-road, all-terrain vehicle to be operated in the snow and mud. Advertisements by Yamaha, which were introduced in evidence, billed the ATV 225 and its other all-terrain vehicles as recreational vehicles. The control features of a Yamaha ATV 225 are similar to that of a motorcycle. The distinctive features of the Yamaha ATV 225 are its three oversized wheels designed for adverse terrain conditions and its solid rear axle which propels both rear wheels forward at the same rate of speed. These distinctive features affect the maneuverability of the vehicle and require the rider to respond to uneven or changing terrain by a shift in weight and manipulation of the hand and foot controls and the steering apparatus. Thus, the ATV 225 is a "terrain active" or "rider interactive" vehicle which requires experience and practice to operate safely.
On appeal, appellant, Antley, Sr., urges trial court error in the following particulars:
1. The jury erred when it determined that Mrs. Jimmy Warford (Beverly) was free of any fault or negligence in causing Rickey's death.
2. The jury erred when it determined that Antley, Sr. was 50% at fault in causing Rickey's death.
3. The trial court erred when it denied plaintiff's motion for a judgment notwithstanding the verdict, and, in the alternative, for a new trial.[2]

NEGLIGENCE OF YAMAHA MOTOR CORPORATION, U.S.A.
We note at the outset that the trial judge erred when he permitted the jury to determine on its own whether or not witnesses tendered as experts by the plaintiff and defendant were qualified to testify as experts. The determination as to whether or not a witness possesses the necessary expertise to give expert opinion testimony is for the trial judge to decide not the jury. Carvell v. Winn, 154 So.2d 788 (La.App. 3rd Cir.1963), writ refused, 156 So.2d 603 (La.1963). However, in this case, the error is harmless as the record does not reflect that the jury afforded any improper weight to the testimony of these witnesses.
We first consider Yamaha's answer to the appeal seeking a reversal of the trial court's judgment insofar as it casts Yamaha 50% at fault in causing Rickey's death.
The jury apparently found Yamaha negligent on the basis of strict tort products liability. In determining whether a product is defective, our Supreme Court, in Halphen v. Johns-Mansville Sales Corp., 484 So.2d 110 (La.1986), stated in pertinent part as follows, at pages 113-115:

*700 "There is general agreement upon the most basic principles of strict tort products liability. In order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The plaintiff need not prove negligence by the maker in its manufacture or processing, since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its product. Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La.1981); DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981); Hunt v. City Stores, 387 So. 2d 585 (La.1980); Chappuis v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978); Weber v. Fidelity & Casualty Ins. Co. of New York, 259 La. 599, 250 So.2d 754 (1971).
* * * * * *
A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product.2 Hunt v. City Stores, Inc., 387 So.2d 585 (La. 1980); cf. Entrevia v. Hood, 427 So.2d 1146 (La.1983); Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133, 140 (1971). See Elmore v. Owens-Illinois, Inc., 673 S.W.2d 434 (Mo.1984); Turner v. General Motors Corp., 584 S.W.2d 844 (Tex.1979); Carter v. Johns-Manville Sales Corp., 557 F.Supp. 1317 (E.D.Tex.1983); Prosser and Keeton on Torts, p. 699 (5th Ed. 1984); Keeton, Torts, Annual Survey of Texas Law, 1981, 35 Sw.L.J. 1, 9 (1981); Keeton, The Meaning of Defective in Products Liability Law, 45 Mo.L.Rev. 579, 592 (1980). This theory considers the product's danger-in-fact, not whether the manufacturer perceived or could have perceived the danger, because the theory's purpose is to evaluate the product itself, not the manufacturer's conduct. Likewise, the benefits are those actually found to flow from the use of the product, rather than as perceived at the time the product was designed and marketed. The fact that a risk or hazard related to the use of a product was not discoverable under existing technology or that the benefits appeared greater than they actually were are both irrelevant. Hunt v. City Stores, Inc., supra; Keeton, The Meaning of Defect, supra, p. 595; Keeton, Products LiabilityInadequacy of Information, 48 Tex.L.Rev. 398, 407-408 (1970). Under this theory, the plaintiff is not entitled to impugn the conduct of the manufacturer for its failure to adopt an alternative design or affix a warning or instruction to the product. A warning or other feature actually incorporated in the product when it leaves the manufacturer's control, however, may redeuce the danger-in-fact. If a plaintiff proves that the product is unreasonably dangerous per se, it is not material that the case could have been tried as a design defect case or other type defect case.
A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be. See Weber v. Fidelity & Casualty Ins. Co., N.Y., supra (cattle dip arsenic content exceeded intended specifications); MacPherson v. Buick Motors, 217 N.Y. 382, 111 N.E. 1050 (1916); Prosser and Keeton on Torts, p. 695 (5th ed. 1984); Wade, Strict Tort Liability of Manufacturers, 19 Sw.L.J. (1965); Keeton, The Meaning of Defect, supra, p. 586. A manufacturer or supplier who sells a product with a construction or composition flaw is subject to liability without proof that there was any negligence on its part in creating or failing to discover the flaw. Evidence of what knowledge was available to the manufacturer has no relevance in such cases because the product, by definition, failed to conform to the manufacturer's own standards. 1A Frumer & Friedman, Products Liability 12.07[4][b][ii].

*701 Although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Winterrowd v. The Travelers Indemnity Co., 462 So.2d 639 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La. 1981); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978); cf. Rey v. Cuccia, 298 So.2d 840 (La.1974). In performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby. See Keeton, Product Liability Problems Pertaining to Proof of Negligence, 19 Sw.L.J. 26, 30-33 (1965). A manufacturer also has a duty to test and inspect its product, and the extent of research and experiment must be commensurate with the dangers involved. See Dartez v. Fibreboard Corp., 765 F.2d 456 (5th Cir.1985); Gideon v. Johns-Manville, 761 F.2d 1129 (5th Cir. 1985); Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1089 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); 1 Frumer & Freedman, Products Liability § 6.01[1] & [2]; Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816, 853 (1962). Under the failure to warn theory evidence as to the knowledge and skill of an expert may be admissible in determining whether the manufacturer breached its duty.
A product may be unreasonably dangerous because of its design for any one of three reasons: (1) A reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product. This is the same danger-utility test applied in determining whether a product is unreasonably dangerous per se. Keeton, The Meaning of Defect, supra, p. 592; Cf. Hebert v. Brazzel, supra. This first reason for concluding that a design is defective is governed by the same criteria for deciding whether a product is unreasonably dangerous per se. The overlap in categories makes it unnecessary to decide whether a product's defect is one of design or of another kind if the product is proven to be unreasonably dangerous per se. (2) Although balancing under the risk-utility test leads to the conclusion that the product is not unreasonably dangerous per se, alternative products were available to serve the same needs or desires with less risk of harm; or, (3) Although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. See Prosser & Keeton on Torts, p. 699 (5th E. 1984); Keeton Torts, Annual Survey of Texas Law, 35 Sw.L.J. 1, 9 (1981); Keeton, Products Liability Design Hazards and the Meaning of Defect, 10 Cum.L.Rev. 293, 306 (1976); Wade, on the Nature of Tort Liability for Products, 44 Miss.L.J. 825, 837 (1973)."
Introduced as plaintiff's exhibit number six was the Fortieth Report By The Committee On Government Operations (together with additional and dissenting views) entitled "Consumer Product Safety Commission's Response to Hazards of Three-Wheel All-Terrain Vehicles [ATV's]" and submitted to Congress on July 16, 1986.[3] *702 The Committee made the following findings:
"(1) The committee finds that the use of ATV's presents both an unreasonable and an imminent risk of death and serious injury requiring immediate enforcement action by the Consumer Product Safety Commission. An adequate data base has long since existed for making this determination.
(2) The committee finds that the Congress has provided the CPSC with ample emergency authority to eliminate from the marketplace on an expedited basis, unreasonably hazardous consumer products. By failing to use these special powers to prevent continuing deaths and injuries related to ATV use, the CPSC has failed in its responsibility to protect the public.
(3) The committee finds that ATV's present an imminent and unreasonable risk of death, serious illness or severe personal injury under section 12 of the Consumer Product Safety Act.
(a) The committee's finding of an "unreasonable" risk is based on a balancing of the likelihood and severity of the injuries that may result from ATV use against the harm such a finding imposes upon manufacturers and consumers. This balancing includes consideration of the following:
(i) Number and severity of injuries and deaths: Injuries and deaths associated with ATV use are unacceptably high. Injuries and deaths attributable to ATV use already exceed the toll attributable to any product known to have been banned or recalled through Federal regulatory agency action.
(ii) Distribution of injuries by age groups: A significant number of ATV injuries occur among children who are unable to adequately protect themselves from the hazard.
(iii) Analysis of number of deaths and injuries and severity of injuries as compared to similar products: ATV-related injuries and deaths, in absolute and relative terms, exceed those attributable to similar products such as motorcycles or snowmobiles.
(iv) Information concerning the utility of the product: ATV's are used primarily for recreational purposes.
(v) Engineering and technical data: Because of their stable appearance, many users are deceived into believing that ATV's may be driven safely by users of all ages and skill levels. In fact, the vehicle's unique handling characteristics require substantial skill, strength and coordination to operate safely.
(vi) Human factors: Even experienced riders who have not engaged in rider misuse are often the victims of fatalities and serious injuries.
(vii) State laws: State laws are inadequate to deal with the problem.
(viii) Voluntary action: Voluntary training programs and voluntary standard development by manufacturers of ATV's have been exceedingly slow and inadequate to deal with the risks of ATV use.
(b) The committee's finding of an "imminent" risk is based on a review of numerous accident reports and other data demonstrating that loss of control of the vehicle leading to death or serious injury can manifest itself virtually at any time and occurs regularly regardless of whether rider misuse is involved or not. It is also based on the absence of any demonstrated correlation between significant driver misuse and injury from vehicle use.
(4) The committe finds that ATV's constitute a substantial product hazard under section 15 of the CPSA. This finding is based on the large and increasing number of ATV incidents involving serious injuries and deaths; the large and increasing number of products in use; the fact that all of the products present the potential for serious injury or death; the fact that overturning and loss of control are found in a majority of investigations regardless of possible rider misuse and regardless of the experience of the rider; and the inability or unwillingness of users to understand or heed warnings *703 and instructions accompanying the product in many cases.
(a) The committee finds that ATV's present one or more of the following types of patterns of defects (any one, combination, or all of which could present a substantial product hazard): A design defect based on inherent instability; a defect based on failure to adequately warn the rider of the hazards and risk of injury presented by the vehicles; a defect based on failure to adequately instruct the rider in the use, operation and maintenance of the vehicles; and defects relating to specific components of the vehicles.
(b) In determining whether the risk of injury presented by ATV's is the type of risk which render these vehicles defective, the committee finds as follows: ATV's are used primarily for recreational use; therefore, the utility and benefits afforded to the general public by their use are limited. In contrast with the limited benefits, the nature of the risk of injury is severe, including paralysis and death. The risk of injury is substantial in both absolute and comparative terms, and is increasing at an alarming rate as the estimated number and use of ATV's increase. The populations at risk are primarily children and young adults. Children may not have sufficient motor skills or ability to understand or appreciate the hazards and risk of injury presented by the ATV's. Young adults may not be likely to appreciate these concerns either. It is also questionable whether the user population in general would follow warnings relating to these concerns, or instructions for use of the vehicles.
(5) The committee finds that the steps already taken by the CPSC, the ATV-manufacturers and the States to deal with the ATV-safety problems have not yet and will not soon result in timely remedial actions to prevent continued deaths and injuries related to ATV use."
The Committee's report includes the recommendation, among others, that manufacturers should immediately halt current production and sales of all-terrain vehicles. The record reflects that subsequent to the release of this report, Yamaha voluntarily ceased production of its three-wheeled all-terrain vehicles, including the Yamaha ATV 225. Paraphrasing the testimony of the experts who testified on behalf of plaintiff would serve no good purpose. Suffice it to say that, in general, their testimony corroborates the findings of the Committee report that the ATV 225 is unreasonably dangerous in normal use and, since used primarily for recreational purposes, its danger-in-fact outweighs its utility.
Given the findings and recommendation of the Committee on Government Operations, the testimony of plaintiff's expert witnesses, and the fact that Yamaha subsequently removed the Yamaha ATV 225 from the market, it was not unreasonable for the jury to conclude that the Yamaha Tri-Moto 225 was unreasonably dangerous per se, i.e., "the danger-in-fact of the product, whether foreseeable or not, outweighed the utility of the product". Halphen v. Johns-Mansville Sales Corp., supra, at page 114. In any event, the record makes clear that the Yamaha 225 is unreasonably dangerous to small children. Brown v. Sears Roebuck and Company, 503 So.2d 1122 (La.App. 3rd Cir.1987), writ granted 506 So.2d 105 (La.1987), affirmed on other grounds, 514 So.2d 439 (La.1987), rehearing denied, 516 So.2d 1154 (La.1988).
Assuming arguendo that the Yamaha 225 is not unreasonably dangerous per se, the jury could have reasonably concluded that the Yamaha ATV 225 was an unreasonably dangerous product because of the manufacturer's failure to adequately warn about a danger inherent in its normal use, i.e., permitting children under the ages of 14-16 to use the product.
Yamaha placed a warning label in the Yamaha YTM225DXL owner's manual in addition to affixing the warning label on the right rear fender of the Yamaha Tri-Moto 225 as illustrated below:
*704 All of the witnesses tendered as experts, including Yamaha's own expert witnesses, testified that no one under the age of 14 to 16 should be permitted to operate the Yamaha ATV 225. These witnesses all agreed that age labeling should have been utilized in this situation, i.e., the manufacturer should have set a minimum age requirement for the operator of this vehicle. Additionally, William F. Kitzes, a board certified product safety manager and a former program manager for the Sport, Recreation, and Power Equipment Section of the Consumer Product Safety Commission, testified that the use of this all-terrain vehicle by children of Rickey's age, size and experience was foreseeable by Yamaha because the warning label required adult supervision when children operate this vehicle. Kitzes further testified that the warning label was also inadequate because it failed to communicate to parents and/or guardians of children what precautions should be taken to protect children from serious injury or death from use of the product. In our view, there was sufficient evidence in the record for the jury to have reasonably concluded that the Yamaha ATV 225 was unreasonably dangerous because of Yamaha's failure to provide an adequate warning of dangers inherent in its use by children which was not within the knowledge or obvious to the ordinary user. Brown v. Sears Roebuck and Company, supra.
*705 In sum, we conclude that the jury did not clearly err when it determined that Yamaha is responsible in strict tort products liability for the death of Rickey. We do find clear error however, in the jury's apportionment of fault and will allude to this error at a later point in this opinion.

NEGLIGENCE OF MRS. BEVERLY WARFORD
Appellant and Yamaha contend that the jury erred when it found Mrs. Beverly Warford to be free of any fault or negligence in causing Rickey's death. We agree.
Our brethren of the Second Circuit in Williams v. Allstate Insurance Company, 268 So.2d 290 (La.App.2d Cir.1972), concisely set forth the duty owed by a supervising person to a child under his or her care and control, when it stated at pages 291-292 as follows:
"As a general rule, a person who undertakes the control and supervision of a child, has the duty to use reasonable care to protect the child from injury. Such a person is not an insurer of the safety of the child, but is required only to use reasonable care commensurate with the reasonably foreseeable risk of harm. Whitney v. Southern Farm Bureau Casualty Insurance Company, 225 So. 2d 30 (La.App.3d Cir.1969). Reasonable care is that degree of care which under the circumstances would ordinarily or usually be exercised by or might be reasonably expected from an ordinary prudent person. Tucker v. Travelers Insurance Company, 160 So.2d 440 (La.App. 2d Cir.1964)."
The record reflects that Rickey had spent the night at the Warford's with the permission of his father and grandfather and was still under the supervision and control of Mrs. Beverly Warford at the time of the accident. Just prior to the accident, Mrs. Warford was aware that Rickey and her nine year old son, Keith, desired to ride the Warford's ATV 225 and were looking for the key to the vehicle. Once the key was located, Mrs. Warford instructed them to check in with Rickey's grandfather who lived down the road from the Warfords. Although Mrs. Warford testified that she initially thought both Keith and Rickey had driven the ATV 225 down the road to Rickey's grandfather's house, the record reflects that Rickey drove alone.
Irrespective of the inadequacy of the manufacturer's warning, we find that Mrs. Warford's conduct in allowing a seven and one-half year old child to operate the ATV 225, either alone or together with her nine year old son, fell below the well recognized jurisprudential standard of reasonable conduct, i.e., "reasonable care commensurate with the reasonably foreseeable risk of harm". The ATV 225 is a large model all-terrain vehicle. It is capable of attaining speeds in excess of 50 miles per hour. The control features of the ATV 225 are similar to that of a motorcycle and its operation requires considerable expertise in the manipulation of hand and foot controls. The record reflects that Mrs. Warford, who often rode the ATV 225, was sufficiently familiar with it and its attributes to have recognized that the operation of such a motor vehicle by a young child of small stature would present a foreseeable risk of serious harm. At the very least, her allowing Rickey's unsupervised use of this vehicle, in violation of the manufacturer's warning, albeit inadequate, constitutes negligent conduct which contributed as a cause-in-fact of Rickey's death. For these reasons, we conclude that the jury clearly erred when it determined that Beverly Warford was not guilty of negligence which was a contributing cause of Rickey's death.

NEGLIGENCE OF RICKEY ANTLEY, SR.
Appellant next urges that the jury clearly erred when it determined that he was 50% at fault in causing Rickey's death. We agree.
Our Supreme Court in Smolinski v. Taulli, 276 So.2d 286, 290 (La.1973), stated:
"Failure to take every precaution against every foreseeable risk or to use extra ordinary skill, caution, and foresight does not constitute negligence or *706 contributory negligence. Turner v. Caddo Parish School Board, 252 La. 810, 214 So.2d 153 (1968); Wheat v. New Orleans and Northeastern Railroad Co., 245 La. 1099, 163 So.2d 65 (1964). A mother of small children is not required to chain them up or to act as their constant jailer in order to absolutely secure them from exposure to hazards negligently created or maintained by a tortfeasor. She is required only to use reasonable precautions, and her conduct in this regard is not negligent if, by a common-sense test, it is in accord with that of reasonably prudent persons faced with similar conditions and circumstances. Cf., Brown v. Liberty Mutual Insurance Co., 234 La. 860, 101 So.2d 696 (1958)."
The record reflects that Antley, Sr. permitted his son to sleep over at the Warfords. There is nothing in the record to suggest that his conduct in this regard was imprudent. Rickey had spent the night at the Warfords on previous occasions and had been well cared for. The record makes clear that Antley, Sr. was unaware that Mrs. Warford allowed her young son, Keith, to ride the ATV 225 and was not aware that she would grant this permission to Rickey. Antley, Sr. testified that he permitted Rickey to ride Floyd Antley's (Rickey's grandfather) smaller ATV under close supervision and for this reason, he specifically cautioned Rickey against riding the Warford's larger ATV. At the time of the accident, Antley, Sr. was not in the vicinity and Rickey was under the temporary control and supervision of Mrs. Warford. Yamaha argues that, in spite of the above, Antley, Sr. is negligent because, knowing his son's fondness for three-wheelers, he should have instructed Beverly Warford not to allow Rickey to ride the ATV 225. If Antley, Sr. were blessed with hindsight, there is no question but that Antley, Sr. would have so instructed Mrs. Warford, or perhaps, he would not have allowed Mrs. Warford temporary control and supervision of Rickey. An individual's conduct is not judged on hindsight but rather upon a common-sense reasonableness test. As stated in Smolinski, supra, "[f]ailure to take every precaution against every foreseeable risk or to use extraordinary skill, caution, and foresight does not constitute negligence or contributory negligence".
Measured by the standard in Smolinski, supra, the precaution taken by Antley, Sr. in instructing Rickey not to ride the Warfords' "three-wheeler" was reasonable under the circumstances. Antley, Sr. should not be held to have foreseen that Mrs. Warford would allow Rickey to ride the large ATV 225 and to have cautioned her otherwise. Accordingly, we reverse the jury's verdict insofar as it finds Antley, Sr. to be 50% at fault in causing the accident and find Antley, Sr. to be free of any negligence or fault in causing the accident in question.

ALLOCATION OF FAULT
Comparative fault is applicable in strict liability cases. Bell v. Jet Wheel Blast, Division of Ervin Industries, 462 So.2d 166 (La.1985). In allocating fault in strict liability cases, a comparison is made between the negligent conduct of a party and the defendant's non-negligent fault. As stated in Howard v. Allstate Insurance Company, 520 So.2d 715 (La.1988):
"... Under this principle, the factfinder compares the causal effect of the plaintiff's conduct with that of the defendant's nonnegligent fault. This comparison is supported by this court's citation in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La. 1985), to the Uniform Comparative Fault Act, Section 2(b), which provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
Thus, the extent to which each party contributed to the damages should be the measure by which the loss is apportioned."
We have carefully considered the facts of this case in light of the factors which should be considered in allocating fault, as *707 set forth in Watson, supra, and conclude that the greater fault rests with Yamaha. Accordingly, we assign 20% of the fault in this fatal accident to Beverly Warford and 80% to Yamaha.

QUANTUM
The jury determined that Antley, Sr. sustained no damages as a result of the death of his young son, Rickey. There is no evidence in the record which would support this finding. To the contrary, the record reflects that, although Antley, Sr. and Jeri were divorced and Rickey lived with his mother, Antley, Sr. and Rickey enjoyed a close and continuing relationship. The jury's determination that Antley, Sr. suffered no damage as the result of his son's death was clear error.
Since we determine that the jury abused its much discretion in failing to award any damages to Antley, Sr., we will amend the judgment in that regard, however, in doing so, we are limited to raising the award to the lowest point which is reasonably within the discretion of the trial court. We find that the lowest reasonable amount which could be awarded to Antley, Sr. for the loss of his son is the sum of $50,000.00
EFFECT OF THIS COURT'S FINDING OF CONTRIBUTING NEGLIGENCE ON THE PART OF BEVERLY WARFORD
The Warfords and Allstate settled with plaintiff and intervenor prior to trial and the latters' demands against these parties were dismissed with prejudice. We have found Beverly Warford to be jointly liable with Yamaha for the death of young Rickey. The result which follows, under such circumstances, is as set forth in Joseph v. Ford Motor Company, 509 So.2d 1 (La.1987):
"... An obligee's release of a joint tortfeasor reduces the amount recoverable against the remaining tortfeasors by the amount of the virile (pro rata) share of the one released, since the plaintiff, in releasing a joint tortfeasor, has prejudiced the remaining tortfeasors by depriving them of their right of contribution from the one so released. Wall v. American Employers Insurance Co., 386 So.2d 79, 82 (La.1980); Canter v. Koehring Co., 283 So.2d 716, 727-28 (La. 1973); Harvey v. Travelers Insurance Co., 163 So.2d 915, 920-22 (La.App. 3 Cir.1964). See also C.C. 1803 (1985),5 which codified the Harvey rule...." (footnote omitted).
Accordingly, the judgment which we render in favor of Antley, Sr. against Yamaha is subject to reduction to the extent of 20%. On the other hand, the judgment of the trial court in favor of Jeri Antley Norman will remain undisturbed as Yamaha did not appeal and the judgment vis-a-vis Jeri Antley Norman and Yamaha is final.

CONCLUSION
For the above and foregoing reasons, we reverse and set aside the trial court judgment insofar as it decrees Rickey Lynn Antley, Sr. 50% negligent, denies him any recovery of damages, dismisses his demands against Yamaha Motor Corporation, U.S.A., and casts him with one-half of the costs. We amend the allocation of fault in this case, finding Mrs. Beverly Warford 20% at fault and Yamaha Motor Corporation, U.S.A., 80% at fault. In all other respects the judgment of the trial court will be and the same is hereby affirmed. Accordingly, we order, adjudge and decree that there be judgment in favor of Rickey Lynn Antley, Sr., and against Yamaha Motor Corporation, U.S.A., in the full sum of FORTY THOUSAND AND NO/100 ($40,000.00) DOLLARS, with legal interest from date of judicial demand until paid. We further order, adjudge and decree that Yamaha Motor Corporation, U.S.A., be cast with all costs of this proceeding both at the trial level and on appeal. In other respects, the judgment appealed from is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND, RENDERED.
NOTES
[1] The distributor of the Yamaha ATV 225 is alternately referred to in the transcript as Ed Steward, d/b/a Honda Village, and also Ed Stewart, d/b/a Cane River Cycles, Inc. In the trial court's judgment, this defendant is referred to as Ed Stewart, d/b/a Cane River Cycles, Inc.
[2] The parties to this appeal do not question the trial court's judgment, insofar as it exonerates Jeri Antley Norman, Jimmy Warford, Ed Stewart and/or Cane River Cycles, Inc., from any negligence in this matter.
[3] The Committee on Government Operations' report is based on a study made by its Commerce Consumer and Monetary Affairs Subcommittee which in turn is based on its oversight investigation of the Consumer Product Safety Commission's response to the hazards of all-terrain vehicles.

Although this report was admitted in evidence over Yamaha's in limine objection, Yamaha does not urge on appeal that the trial court erred in permitting its introduction in evidence.
The fact that this report was compiled subsequent to the accident in question is of no moment. See Halphen v. Johns-Mansville Sales Corp., supra, at page 114.